## Evans *et al. versus* Matson *et al.,* Assignees.

1. A sheriff having in hand distinct executions against Lake and Corley,
levied on lumber as the property of Lake and delivered it to the plaintiff in
the execution against Lake, taking from him a bond reciting that execution
and levy of the goods as the property of Lake, conditioned for the return
of the lumber on a day named; the property was afterwards ascertained to
be Corley's.   *Held,* that the obligors were liable for the forthcoming of the
lumber to meet the exigencies of the executions against Corley.

2. The recital in the obligation was merely explanatory of the sheriff's pos-
session of the property, and did not restrain the liability of the obligors.

3. On the execution against Corley, the sheriff returned that he had levied
on the lumber and had sold it under a prior execution; the jury found that
this return was fraudulently procured by the obligor. *Held,* that this did not
estop the sheriff and his assignees in a suit on the bond from showing the
facts, and that the return was not correct.

ERROR to the Court of Common Pleas of *Jefferson county,* in
which this was an action of debt by Uriah Matson and others,

[Evans *v.* Matson.]

assignees of Thomas S. Mitchell, sheriff, against J. B. Evans and others, his sureties on a bond in the penalty of $10,000.

A *fi. fa.* had been issued at the suit of Evans against one Lake, and one the same day at the suit of Lucas & Barr against one Corley; thirteen rafts of timber had been levied on as the property of Lake, at his mills, but it afterwards appeared that the timber belonged to Corley. See Mitchell *v.* Commonwealth, 1 Wright 187. On the 18th of April 1856, all these executions being in the sheriff's hands, he delivered the lumber to Evans on the bond in suit, which recited the levy of the timber on the execution of Evans, with the condition that Evans should deliver the timber to Mitchell, at Brookville, on the 24th of April instant. The same lumber was on next day levied on as the property of Corley under the executions against him, and so returned by the sheriff. On that day or the day after, Evans started it for Pittsburgh, in charge of Elliott, a deputy of the sheriff, who had the writs of *fi. fa.* in his hands, which he might show to protect it from stoppage *in transitu.* Evans, on the 23d of April, procured Fullerton, acting as deputy sheriff, to sell the lumber, then on its way to Pittsburgh, against the protest by Arthur, an execution-creditor, and the attorney for Lucas, an execution-creditor; that the lumber was not present, and the lumber was struck off to Evans for $197. The sheriff returned on Barr's writ—which was No. 97—the sale and the appropriation of the money, none of which went to Lucas. On Lucas's writ he returned: "The within property sold on *fi. fa.*, No. 97, and money applied on same." Evans, on the 10th of May, stayed proceedings on his execution against Lake.

Lucas afterwards brought suit against the sheriff and his sureties for false return, and recovered a verdict for $1835.65, which was paid by the sureties, the plaintiffs in this suit, the sheriff being insolvent; he then assigned to them the bond of Evans, given for the forthcoming of the lumber, and in this suit they allege as breach, the want of the return by Evans of the lumber on 24th of April 1856.

The court (Derrickson, A. J., of the Sixth District), after stating the facts, charged:—

"As previously mentioned, the defence to the right of recovery is vested on the conclusiveness of the deputy sheriff's return, and unless the evidence adverted to is sufficient to satisfy the jury of an intentional wrong and gross fraud both upon the law and the parties in interest at the time, it must prevail; but not so if the other is shown to have existed. A sheriff's return to an execution, like the judgment of which it is predicated, is conclusive on all parties and privies so long as it remains unaltered or unrecovered. But if it can be shown that it was procured through fraud, in which the sheriff himself had no participation, and of which he was personally uninformed and ignorant at the time, the

[Evans *v.* Matson.]

person perpetrating the fraud cannot shelter himself under the return. The contrivance by which Evans originated and carried out his schemes may evince sharpness and ingenuity, but no honesty, nor even a shadow of it. The lumber is stopped by him on the pretence that it belonged to an execution-debtor of his, one Lake, but without proceeding further in this direction he does what he had no right or business to do, has a deputy appointed to take charge of *fi. fas.* in which other parties were plaintiff and defendant, and in which he has no interest whatever, and through his agency has the lumber delivered to himself, and then sent off with the writs under the direction of the deputy, and, after all are gone, gets another individual to sell the lumber against the protestation of the real owners and creditors, and buys it in himself at a mere nominal sum, while he cautions others not to bid; then boasts of what he had done, and has the deputy make return to the writs as best suits himself. If such mockery of legal proceedings is to serve as a shelter to those engaged in these manipulations, then the forms of law with us are as inflexible as were the laws of the Medes and Persians. But we dare not countenance a doctrine like this. If those who were professing to act as deputies had not been what we might possibly suppose them to have been, the innocent dupes of the chief actor, it is very questionable whether an indictment would not lie against the whole of them for a conspiracy. Conduct of this character does not comport with moral honesty nor the due administration of justice, and the individual who seeks refuge under it must show himself free from all complicity with it, as the law which he invokes for his protection is so stern and unyielding that its very forms are unassailable by fraud, however gross and apparent.

"For the present we say to the jury, that if they believe the evidence, it makes out a case sufficient to warrant a verdict for the plaintiff, and what is said will serve as a sufficient answer to negative the propositions contained in the points made by the defendant's counsel."

The defendant assigned for error that the court erred:—

1. In not answering the defendant's first and second points, either specifically or generally, in the charge.

2. In putting the breach of the bond and the plaintiff's right to recover, on the ground of the subsequent fraud of Evans, and in charging, *inter alia*, "The defence is that the boards were sold by the sheriff on *fi. fas.* in favour of certain creditors of Corley, and bought in by Evans and the proceeds appropriated according to the return made by the sheriff's deputy, and that the same is conclusive on the sheriff and all others until reversed or set aside. The reply to this is, that the sales and returns thereof were, by the connivance and management of Evans, and perhaps of others who were aiding him, fraudulent, void, and therefore no bar to a

[Evans v. Matson.]

recovery on the bond. To arrive therefore at anything like a correct conclusion in the controversy, it is necessary to scan closely the testimony, and see whether it unfolds such a case as the plaintiffs contend for, for if it does, it will necessarily impair the defence," &c.

3. In refusing to answer the defendant's first point in the affirmative, which point is "That the condition of the bond being for the delivery of property of F. D. Lake to answer the exigencies of a writ against him, that condition is not broken by a want of a delivery of that property as the property of any one else but Lake, and as no damage resulted to the sheriff for want of such delivery on the writ against Lake, the plaintiff cannot recover."

4. In refusing to answer the defendant's second point affirmatively, which point is "That by the reseizure of this same property, on the 19th of April 1856, as the property of William Corley, the sheriff thereby repossessed himself of that property, and he alone would be responsible for its safe-keeping until the day of sale, and if it was eloigned in the mean time he alone would be responsible.

5. In answering the defendant's third point in the negative, which point is "The return of sale concludes the sheriff, and that the sale which was made on the 23d of April 1856, the day before the property was to be delivered as that of Lake, estops the sheriff from denying that the property was in his hands at that time, and regularly disposed of as the property of Corley.

6. In refusing to answer the defendant's fourth point in the affirmative, which point is "Under all the testimony in this case the plaintiffs cannot recover."

The verdict was for the plaintiffs for $2845.74.

*Gordons*, for plaintiff in error.—The court was bound to give an explicit answer to the points: Noble *v.* McClintock, 6 W. & S. 58.

The selling under the Barr writ satisfied that writ, and relieved the sheriff; he therefore had no reason to complain. Evans's conduct could not affect the sheriff, for he was indemnified as to Evans's own execution, which was right. When he re-levied on the property, it was in his own possession. If Evans, after that, took it, he was a trespasser, and the sheriff had an action for the tort, but not on the bond. So if it was a fraud.

But whatever Evans's liability, his surety can be held only literally to the bond: Commonwealth *v.* West, 1 Rawle 31; Arlington *v.* Merrick, 2 Saund. 411; Miller *v.* Stewart, 9 Wheat. 702–3; Hutchison *v.* Commonwealth, 6 Barr 124. This bond is for Lake's property, and the damage was for want of delivery of Corley's property. The levy for the debt against Corley was the day after the bond was executed. A surety cannot be held for a subsequent

1 P. F. SMITH—24

[Evans *v.* Matson.]

liability. This will apply to Evans also. No recovery could be had on the face of the bond; it must be reformed, which in our practice is done by a court and jury: Moser *v.* Libenguth, 2 Rawle 428. But to do this here would be making a new bond. The reformation asked must be set out in the declaration: Clark *v.* Partridge, 2 Barr 15; Barndollar *v.* Tate, 1 S. & R. 162; Butcher *v.* Metts, 1 Miles 155.

The reseizure of the lumber released the surety: Commonwealth *v.* Miller, 8 S. & R. 457; Talmage *v.* Burlingame, 9 Barr 23. And as to the surety the sale concluded the sheriff finally. He is bound by his return: Brownfield *v.* Commonwealth, 13 S. & R. 267; McClelland *v.* Slingluff, 7 W. & S. 134; Kingsing *v.* McElrath, 5 Barr 467. It was error to treat Lake's and Corley's *rights* as inseparable because the property was the same: Freeman *v.* Caldwell, 10 Watts 10. Evans could not defend on this bond that the property was Corley's: Nagle *v.* Shoh, 4 Watts 124.

*W. P. Jenks*, for defendants in error.—1. The bond was for the delivery of the lumber itself, without regard to its ownership. The recital of Lake's execution only did not affect this: Watmough *v.* Francis, 7 Barr 207.

2. In point of fact, the lumber was not reseized by the sheriff; it had been removed.

3. A sheriff's return is no more sacred than other judicial proceedings: it may be avoided for fraud, which does not implicate him, and may be controverted by his sureties, when its irregularities arose from one who seeks to recover against them. The return is by the fraudulent acts of Evans; and no right can be deduced from them: Gilbert *v.* Hoffman, 2 Watts 68; Foulk. *v.* McFarland, 1 W. & S. 299; Lowry *v.* McMillan, 8 Barr 163; McKee *v.* Penrose's Sureties, at Nisi Prius 1803, MS.; 1 Wh. Dig. 890, pl. 1357.

The opinion of the court was delivered, January 8th 1866, by

STRONG, J.—The assignments of error in this case raise but two questions. The one relates to the construction which should be given to the bond, and the other to the effect of the sheriff's return to the executions in his hands. When the bond was given, there were several executions in the sheriff's hands, one against F. D. Lake, and the others against William Corley. Of course the executions were liens upon the personal property of the defendants. In virtue of one of them, at the suit of J. B. Evans, the sheriff had levied upon thirteen rafts of pine boards, as the property of Lake. These he placed in the possession of the plaintiff in that execution, taking his bond with sureties for the delivery of the rafts on the 24th of April 1856. But though

[Evans v. Matson.]

levied upon as the property of Lake, the rafts appear to have been the property of Corley, and, as such, the sheriff had a lien upon them in virtue of the executions in his hands against Corley. Evans having thus obtained possession of the lumber, ran it out of the county before the day fixed for its delivery to the sheriff, and subsequently stayed his own execution against Lake. Having in this manner prevented the sheriff from making a proper sale of the lumber under the executions against Corley, he now contends that his bond bound him only to deliver the rafts to the sheriff to answer his own execution against Lake, and that, having stayed that, there was no breach of the bond by which the sheriff was damaged. But this was not the extent of the obligation which he and his sureties assumed. They bound themselves unqualifiedly in the sum of $10,000 to deliver the lumber to their obligee on the 24th day of April 1856. Their obligation was absolute. It was not merely to deliver so far as necessary to answer the execution against Lake, or necessary for any specified purpose. They had nothing to do with the nature and extent of the sheriff's ownership. It was not for them to inquire what claims he might have at the date of the bond, or at the time fixed for the delivery. But if the sheriff seized the lumber as the property of Lake, when in truth it belonged to Corley, he could not surrender it to Evans without being answerable to Corley or Corley's creditors for its whole value, no matter what may have been the amount of the execution against Lake. That execution was no measure of his interest in the possession of the property. Yet that entire interest it must be presumed the parties intended to secure by the bond, in the absence of any expression to the contrary, as fully as it would have been secured by the sheriff's retention of possession: Watmough v. Francis, 7 Barr 215–16. It would be giving undue effect to the recital introductory to the defeasance, were we to hold that it restrains the liability of the obligors. It is explanatory of the sheriff's possession, but nothing more. It is itself no part of the condition. Such being, in our opinion, the proper construction of the bond, it was not error to refuse to instruct the jury that failure to deliver the rafts was no breach of the bond, for which the defendants were liable, if the property was not required to answer the execution against Lake.

The next question relates to the effect of the sheriff's return to the executions against Corley. It was that he had levied upon the rafts on the 19th day of April 1856 (the day after the bond was dated), and sold them on the 23d of April, under a prior execution. This, it is insisted, concludes the sheriff and establishes against him that he resumed possession of the lumber after the bond was given, and consequently that the obligors were no longer under obligations to deliver it.

[Evans *v.* Matson.]

Undoubtedly a sheriff is bound by his return, and a return of a levy is proof against him that he has taken possession of the goods upon which the levy was made. In this case, as between the sheriff and the execution-creditors of Corley, the return would conclusively establish that he had possession of the rafts on the 19th of April 1856. But the question now is between him and Evans, who was no creditor of Corley, and it is whether Evans can set up a false return which he fraudulently procured the sheriff to make. The verdict of the jury determines that the return was thus procured by Evans. If so, is it in law any return at all? Can he avail himself of it as an estoppel, or use it for any purpose? The answer is plain. Fraud vitiates everything it touches. Even judgments fraudulently procured, are void, and sheriffs' returns are no more sacred. And nothing is more clear than that a guilty participant in a fraud can derive no legal benefit from it. But it is argued that though Evans might be responsible for his fraud in an action of trespass upon the case, it cannot be made use of in this action on his bond. Not so. It is not sought now to recover damages for his tort, but to prevent his using the tort to relieve himself from his contract. By setting up the return as a defence to this action, he is setting up his own fraud and endeavouring to deduce a right from it. He is in effect the actor. This cannot be permitted. In no form of action can he, either as claimant or defendant, obtain an advantage from his own covin. He may lose, but he cannot gain. And certainly his sureties in the bond can, in this particular, stand in no better position than their principal. They assumed the same obligation that he assumed. The obligee has done nothing voluntarily to release them. And it was not in the power of their principal to release them by any act of his that did not discharge the bond. Much less could he release them by a fraud upon the obligee. The court was therefore right in refusing to affirm the defendant's second, third and fourth points, and in leaving to the jury to find whether the returns and the sale were void in consequence of the fraudulent conduct of Evans, and instructing them that if the returns and sale were fraudulently procured by Evans, and therefore void, they were no bar to the plaintiffs' recovery.

Judgment affirmed.